UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: ) | Chapter 7 |
| ) | |
| POLO BUILDERS, INC., *et al.*, ) | No. 04 B 23758 |
| ) | (jointly administered) |
| Debtors. ) | |
| ) | |
| ) | |
| DAVID R. BROWN, Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 06 A 1140 |
| ) | |
| KAMIL JOB; MANCO CARPENTRY ) | |
| GROUP; MANCO CONSTRUCTION, ) | |
| INC.; and MANCO HOMES, INC., ) | |
| ) | |
| Defendants. ) | Judge Goldgar |

**MEMORANDUM OPINION**

Kamil Job's company, Manco Construction, Inc., did construction work for Polo Builders, Inc., a Chicago area real estate developer, but Polo Builders did not pay all of Manco Construction's bills. In 2004, Polo Builders sold to Job the building in Villa Park, Illinois, that housed its offices, giving him a hefty credit at closing for the amount of the unpaid Manco Construction bills. The next day, Polo Builders filed a chapter 11 bankruptcy case, later converted to chapter 7.

Chapter 7 trustee David Brown subsequently filed an adversary proceeding against Job as well as three construction companies Job owns or used to own. In his complaint, Brown sought to avoid the sale of the property or alternatively to avoid the credit Job received at the closing. The matter is now before the court for ruling following trial.

For the reasons that follow, judgment will be entered in favor of the corporate defendants on all claims in the complaint and in favor of Job on Brown's claim to avoid the sale of the property. Judgment will be entered in Brown's favor, however, on his claim to avoid the credit as a preference. The claim to avoid the credit as a fraudulent transfer will be dismissed as moot.

### 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (F), and (H).

### 2. Facts

The evidence at trial showed the following.[1] From 1999 or 2000 until 2004 when it ceased doing business, Manco Construction, Inc. was engaged in business as a carpentry subcontractor. (Tr. 15-17). Kamil Job was an officer and shareholder of Manco Construction. (*Id.* 16; Stip. ¶ 2). Job has since done construction work under the names Manco Homes and Manco Carpentry Group, both corporations of which he is the sole shareholder. (Tr. 18).

Beginning in 2000, Manco Construction began performing carpentry work for Polo Builders as a subcontractor on various construction projects. (Tr. 19-20; Stip. ¶ 1). Manco Construction submitted invoices for its work, but Polo Builders failed to pay all of the invoices. (Tr. 20-21; Stip. ¶ 4). As of March 2004, Polo Builders owed Manco Construction at least $190,000. (Stip. ¶ 5; *see* Tr. 21; P. Ex. 1).

---

[1]  This opinion cites the trial transcript as "Tr. [page number]," the parties' stipulation of facts as "Stip. [paragraph number]," Brown's exhibits as "P. Ex. ___," and Job's exhibits as "D. Ex."

In 2004, Polo Builders had its offices at 723-725 North Addison Road in Villa Park, Illinois (the "property"). (Tr. 20). The property was improved with a two-story, mixed-use office and apartment building. (*Id.* 45-46; P. Ex. 4 at 3). The first floor contained two office and retail units that had been combined into one. (P. Ex. 4 at 3; *see* D. Ex. 7 at 2). The second floor contained apartments (Tr. 45, P. Ex. 4 at 3), but Polo Builders had converted the apartments into offices (Tr. 45-46). The building had windows on the first floor facing Addison Road (*id.* 45; *see* D. Ex. 7 at 2), and there was a parking area in front between the building and the street itself (Tr. 48, 50-51).

In early 2004, Polo Builders offered to sell the property to Job. (*Id.* 21-22). Job was interested in moving his own offices to the site (*id.* 22), and on March 16, 2004, Job entered into an agreement with Polo Builders to buy the property (*id.* 22-23; Stip. ¶6), signing a standard form commercial real estate contract (*see* P. Ex. 2). The purchase price shown on the contract was $890,000. (*Id.*).

The contract also provided for earnest money of $190,000. (*Id.*). The $190,000, however, did not represent a deposit Job paid to Polo Builders, and no money changed hands. (Tr. 24; Stip. ¶ 12). The earnest money figure instead represented the $190,000 that Polo Builders still owed Manco Construction. (Tr. 24). The intention was to give Job a credit of $190,000 against the purchase price, extinguishing Polo Builders' debt. (Stip. ¶ 12).[2]

---

[2] The debt was owed to Manco Construction, not to Job, since Manco Construction (a corporation) had done the work. But the parties draw no distinction between Manco and Job – and neither, for that matter does Job, testifying that as far as he was concerned payments to Manco Construction were payments to him "because I was the sole owner of Manco, and all the benefits of Manco would go to me anyways." (Tr. 42-43). Since the parties have treated Manco Construction and Job as alter egos, at least for purposes of this adversary proceeding, the court will do so as well.

Job ran into financing problems, and it was necessary to extend both the financing contingency in the contract and the closing date. (Tr. 25; Stip. ¶ 9). In connection with Job's application for financing, his bank had an appraisal prepared in early June showing the property was worth less than $890,000. (Tr. 25-26; Stip. ¶ 8; *see* P. Ex. 4). Job accordingly asked Polo Builders to reduce the price (Tr. 29), and Polo Builders agreed, reducing the price to $810,000 (Stip. ¶ 10).[3/]

At 5:24 p.m. on June 22, 2004, the sale of the property closed. (Tr. 30-31; Stip ¶ 11; *see* P. Ex. 7, box "A"). At the closing, Job was given credit for the "earnest money" consisting of the $190,000 Polo Builders owed him. (P. Ex. 7, box "J," l. 201, and box "K," l. 506). The credit had the effect of reducing the Polo Builders debt to Manco Construction. (Tr. 41-42; *see also* P. Ex. 11 at 54). A deed transferring the property to Job was prepared (*see* P. Ex. 8), but the deed was not recorded until June 30, 2004 (Stip. ¶ 17).[4/] Apparently in connection with the closing, Job and Polo Builders also entered into a "post-closing possession agreement" under which Job leased back to Polo Builders two small interior offices on the south side of the first floor of the building. (D. Ex. 7). The duration of the lease was six months. (*Id.*).

---

[3/] A new contract was prepared bearing the $810,000 price and apparently back-dated to March 16, 2004. (*See* P. Ex. 6). But the new contract was not signed, and although Brown introduced it into evidence, it has no particular relevance.

[4/] The deed shows as the grantor, not Polo Builders, but a "Banoo Merchant." (Tr. 35; P. Ex. 8). The settlement statement at the closing likewise listed Banoo Merchant as the seller. (Stip. ¶ 11; P. Ex. 7). Although Job had previously dealt only with representatives of Polo Builders, he learned at the closing that Dr. Sheri Banoo Merchant was the legal owner of the property. (Tr. 35; Stip. ¶ 7). (Dr. Merchant is the wife of Hasan Merchant, owner of Polo Builders. (Tr. 32).) Dr. Merchant's role in the transaction could have complicated the legal analysis here. But Brown has taken the position that the Merchants and Polo Builders were alter egos (*see* Tr. at 13-14), and Job has chosen not to make anything of the point. Since the parties have treated the case as if Polo Builders owned and sold the property, the court will do the same.

Following the closing on June 22, Job went straight to the property and parked his truck, bearing the name "Manco Homes" on the doors, in front of the building. (Tr. 33, 43, 49). Polo Builders personnel were no longer on the premises, but they had left behind desks, file cabinets, files, papers, and other materials – not only in the two offices Polo Builders had leased but upstairs as well. (*Id.* 37-38, 45-46; Stip. ¶ 22).[5] Job and another person began moving Manco office furniture, equipment, and papers into the building. (*Id.* 43-44, 46). The two were there for "several hours." (*Id.* 43).

At seven o'clock the next morning, Job returned to the building with at least five other people. (*Id.* 46). They parked two trucks bearing the "Manco" name in front of the building and, Job said, spent the entire day cleaning the building and moving in "the rest of the stuff we had." (*Id.* 46-49). Job and his assistants worked throughout the building, upstairs and downstairs, including the areas that had windows facing Addison Road. (*Id.* 46-47).

Shortly before four o'clock that afternoon – not twenty-four hours after the closing on the property – Polo Builders, Hasan Merchant, and Sheri Banoo Merchant filed chapter 11 bankruptcy petitions. (Stip. ¶ 14; Btcy. Dkt. No. 1).[6] Another related entity, MG International, LLC, filed a chapter 11 petition six days later, on June 29. (Stip. ¶ 15). The jointly administered cases were converted to chapter 7 in August 2004, and David Brown was appointed interim trustee. (*Id.* ¶¶ 16, 19).

---

[5]    Polo Builders continued to occupy the two leased offices at the building after the sale. (Tr. 37; Stip ¶ 22). It was at least a year before Job was allowed to remove the Polo Builders property. (Tr. 37).

[6]    The precise time was 3:38 p.m. The docket reflects not only the date but the time of filing. (*See* Btcy. Dkt. No. 1). The court can take judicial notice of its own records. *In re Letourneau*, 422 B.R. 132, 135 n.1 (Bankr. N.D. Ill. 2010).

At all times relevant to this matter – meaning from early 2004, when Polo Builders first sought to sell the property to Job, through the date of the Polo Builders bankruptcy filing on June 23, 2004 – Polo Builders was insolvent. (Stip. ¶ 23).

In the Polo Builders bankruptcy, Brown testified, creditors have filed $34 million in secured claims, $3 million in priority unsecured claims, and $22 million in general unsecured claims. (Tr. 6-7). The Polo Builders estate, meanwhile, has $150,000 in assets, and the assets of the other estates total roughly $800,000. (*Id.* 10). Brown also testified he has three sources of future funds for all the estates: several fraudulent transfer adversary proceedings with a potential recovery of $5 million, an adversary proceeding against Hasan Merchant with a potential recovery of $2.5 million, and this adversary proceeding. (*Id.* at 10-11). However, Brown has not objected to any claims, and he is unsure "exactly" how many claims are valid. (*Id.* 11).

In 2006, Brown filed this adversary proceeding against Job and the Manco companies. The complaint has three counts, each pled in the alternative. Count I is a claim to avoid the sale of the property using the trustee's "strong arm" power under section 544(a)(3) of the Bankruptcy Code, 11 U.S.C. § 544(a)(3). Count II is a claim to avoid the $190,000 credit Job received at the closing as a preferential transfer under section 547(b) of the Code, 11 U.S.C. § 547(b), and recover the transfer under section 550(a)(1), 11 U.S.C. § 550(a)(1). Count III is a claim to avoid the credit as fraudulent transfer under section 548(b), 11 U.S.C. § 548(b), and recover it under section 550(a)(1).

### 3. Discussion

Based on the evidence at trial, judgment will be entered for Job on Brown's strong arm claim in Count I. Under section 544(a)(3), Brown occupied the position of a bona fide purchaser

as of the petition date, and on that date a bona fide purchaser would have had inquiry notice that Job owned the property. Judgment will be entered for Brown, however, on his preference claim in Count II. The $190,000 credit was a transfer to Job within the 90-day preference period that allowed him to receive more than he would have as a creditor in the case. As to Job, Count III will be dismissed as moot. Judgment will be entered in favor of the remaining defendants on the complaint.[2]

### a. Strong Arm Claim

The evidence failed to establish Brown's superior right to the property as a hypothetical bona fide purchaser under section 544(a)(3). Job's possession of the property on the petition date would have put a bona fide purchaser on inquiry notice that Job held title, even though his deed from Polo Builders had not been recorded. That notice prevents the bona fide purchaser – here, Brown – from avoiding the sale.

Section 544(a)(3) of the Code, part of the "strong arm" provision, allows a trustee to avoid, among other things, a transfer of the debtor's property that would be voidable by "bona fide purchaser of real property" who "obtains the status of a bona fide purchaser at the time of the commencement of the case . . . ." 11 U.S.C. § 544(a)(3); *see Sandy Ridge Oil Co. v. Centerre Bank, N.A. (In re Sandy Ridge Oil Co.)* 807 F.2d 1332, 1333 (7th Cir. 1986); *Covey v. Citizens Sav. Bank (In re Pak Builders)*, 284 B.R. 663, 677 (Bankr. C.D. Ill. 2002). Whether a bona fide purchaser can avoid a transfer depends on applicable state law. *Belisle v. Plunkett*, 877 F.2d 512,

---

[2]     The parties have stipulated that none of the business entities named as defendants took title to the property, received any payment from any debtor, or received anything of value from any debtor in connection with the sale of the property. (Stip. ¶ 21). Given the stipulation, these defendants should have been dismissed as parties before trial.

-7-

515 (7th Cir. 1989); *Sandy Ridge*, 807 F.2d at 1336; *Pak Builders*, 284 B.R. at 677.

In Illinois, a bona fide purchaser is "one who acquires an interest in property for valuable consideration without actual or constructive notice of another's adverse interest in the property." *Goldberg v. Ehrlich (In re Ehrlich)*, 59 B.R. 646, 650 (Bankr. N.D. Ill. 1986) (discussing Illinois state law); *see also In re Richardson*, 75 B.R. 601, 605 (Bankr. C.D. Ill. 1987). The Bankruptcy Code rules out actual notice, since section 544(a) confers the rights of a bona fide purchaser "without regard to any knowledge of the trustee." 11 U.S.C. § 544(a); *Belisle*, 877 F.2d at 514 n.2 (stating that section 544(a) "specifies that the trustee shall be treated as a person without actual notice"); *Sandy Ridge*, 807 F.2d at 1334-36.

Constructive notice can take two forms: record notice and inquiry notice. *Goldberg*, 59 B.R. at 650. Record notice means notice under section 30 of the Illinois Conveyances Act from an instrument duly recorded in the appropriate public office. *See* 765 ILCS 5/30 (2008). Section 30 "imputes to a purchaser knowledge that could be gained from an examination of the grantor-grantee index in the office of the Record of Deeds," as well as from court records for the county where the property in question is located. *Goldberg*, 59 B.R. at 650; *see also Richardson*, 75 B.R. at 605. Here, Brown lacked record notice of Job's title as of the petition date because the deed conveying the property to Job was not recorded for another week, and no evidence suggested that court records disclosed the conveyance. *Cf. Banco Popular v. Beneficial Sys., Inc.*, 335 Ill. App. 3d 196, 204, 780 N.E.2d 1113, 1120 (1st Dist. 2002) (finding no record notice where deed was unrecorded).

That leaves inquiry notice. Inquiry notice imputes to a purchaser knowledge of facts that a diligent inquiry would have brought to light. *Davis v. Elite Mortgage Servs., Inc.*, 592 F. Supp. 2d 1052, 1056 (N.D. Ill. 2009); *Ehrlich*, 59 B.R. at 650. If, for example, a physical inspection

-8-

would reveal another's adverse interest in the property, the purchaser is charged with knowledge of the facts such an inspection would uncover. *Ehrlich*, 59 B.R. at 650. Nor are those facts limited to the obvious or conspicuous:

> One having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation.

*Miller v. Buffington*, 381 Ill. 238, 243, 44 N.E.2d 850, 852 (1942); *see also Ambrosius v. Katz*, 2 Ill. 2d 173, 182, 117 N.E.2d 69, 74 (1954); *Bryant v. Lakeside Galleries, Inc.*, 402 Ill. 466, 477-78, 84 N.E.2d 412, 418 (1949); *Reed v. Eastin*, 379 Ill. 586, 592, 41 N.E.2d 765, 768 (1942).

It has long been settled in Illinois,[8] as it is elsewhere, *see* 5 Herbert Thorndike Tiffany, *The Law of Real Property* § 1287 at 57 (3d ed. 1939), that possession of property is notice of whatever rights to the property the party in possession claims, *Ambrosius*, 2 Ill. 2d at 182, 117 N.E.2d at 74; *Miller*, 381 Ill. at 243, 44 N.E.2d at 852, and when the party claims title under a deed, possession is equivalent to the recording of the deed, *Miller*, 381 Ill. at 243, 44 N.E.2d at 852; *Banco Popular*, 335 Ill. App. 3d at 210, 780 N.E.2d at 1125. A purchaser therefore has an obligation to ask the party in possession by what right he claims possession and what his interest is. *Bryant*, 402 Ill. at 477, 84 N.E.2d at 418. The purchaser is charged with notice of all facts such an inquiry would reveal. *Id.* at 477-78, 84 N.E.2d at 418; *see also Ehrlich*, 59 B.R. at 650.

What constitutes "possession," however, is less clear. To serve as notice of an unrecorded interest, possession must be "open, visible, exclusive, and unambiguous." *Robertson*

---

[8]    So long, in fact, that more than a century ago the Illinois Supreme Court described the rule as "too well settled to call for the citation of authorities." *Mason v. Mullahey*, 145 Ill. 383, 388, 34 N.E. 36, 36 (1893).

*v. Wheeler*, 162 Ill. 566, 575, 44 N.E. 870, 872 (1896) (internal quotation omitted); *see also Beals v. Cryer*, 99 Ill. App. 3d 842, 845, 426 N.E.2d 253, 255 (5th Dist. 1981); *Burnex Oil Co. v. Floyd*, 106 Ill. App. 2d 16, 21-22, 245 N.E.2d 539, 543 (1st Dist. 1969); *Millikin Trust Co. v. Gregory*, 292 Ill. App. 28, 35, 10 N.E.2d 853, 856 (3d Dist. 1937). At the same time, "neither actual occupancy, cultivation, [n]or residence" is necessary. *Morrison v. Kelly*, 22 Ill. 609, 624 (1859); *see also Chicago Title & Trust Co. v. Darley*, 363 Ill. 197, 202, 1 N.E.2d 846, 849 (1936); *Beals*, 99 Ill. App. 3d at 844, 426 N.E.2d at 255. "Improvements or acts of dominion" showing the possessor has "exclusive management and control" are enough. *Beals*, 99 Ill. App. 3d at 844, 426 N.E.2d at 255; *see also Banco Popular*, 335 Ill. App. 3d at 211, 780 N.E.2d at 1126; *see, e.g., Bryant*, 402 Ill. at 475, 84 N.E.2d at 417 (holding party was in possession who had "commenced to rehabilitate and improve" buildings). Whether a party has possession depends on the facts of each case. *Morrison*, 22 Ill. at 624-25; *Beals*, 99 Ill. App. 3d at 844, 426 N.E.2d at 255.

The evidence at trial showed Job had possession of the Addison Road property as of the June 23 petition date. Right after the June 22 closing, Job went to the property, parked his truck in front of the building, and with another person spent several hours moving furniture, equipment, and papers into the building which was vacant but for Polo Builders office furniture and other items. The next day, June 23, Job and five others returned, parked their trucks in front, and spent the entire day moving in and cleaning up, working throughout the building. A prospective purchaser would have seen the trucks outside and activity inside and would have asked – indeed would have had a duty to ask – why Job was moving in. On posing the question, the purchaser would have learned that Job was the owner, having purchased the property himself the day before. Although Job's deed was not yet recorded, his "[i]mprovements" and "acts of

-10-

dominion" were enough to give notice of his interest. *Beals*, 99 Ill. App. 3d at 844, 426 N.E.2d at 255. Because Brown is charged with notice of that interest, he cannot use the strong arm power in section 544(a)(3) to avoid the transfer.

Contending Job did not have possession, Brown argues that Job's possession was not "unambiguous." *Robertson*, 162 Ill. at 575, 44 N.E. at 872. Brown points out that the trucks parked in front of the building on June 22 and 23 bore the logo "Manco Homes." A prospective purchaser, Brown contends, would have thought Job was simply a contractor working at the building, not a new owner moving in.

This contention might have some force if the Illinois Supreme Court had not rejected it in an old and obscure decision. *See Tillotson v. Mitchell*, 111 Ill. 518 (1884). In *Tillotson*, one Winegardner owned several lots and hired Mitchell, a carpenter, to build houses on them. *Id.* at 521. Winegardner also agreed to sell Mitchell one of the lots (lot 4), with Mitchell paying for the lot through his labor on the others. *Id.* Winegardner conveyed lot 4 to Mitchell, and Mitchell conveyed it to his wife. Winegardner later obtained a loan secured with a trust deed on, among others, the same lot 4. *Id.* When Winegardner defaulted, the trustee sought to sell lot 4, and Mrs. Mitchell asked to have the sale enjoined, asserting her claim to the property. *Id.*

In affirming decisions for Mrs. Mitchell, the court considered "whether Mitchell had such possession as was notice to a subsequent incumbrancer to put him on inquiry" and concluded he did. *Id.* at 523. The court noted that Mitchell had put up a "temporary structure" in which he kept his tools and other articles, and he was "daily present on the land, controlling the labor of others and contributing his own." *Id.* at 524. This, the court said was "actual, open, and visible possession" sufficient to put the lender on notice. *Id.* The trustee argued (much as Brown argues here) that "being a carpenter and engaged in the construction of the house on the lot, there was

-11-

nothing to notify the public that he was not in possession merely as a carpenter and builder, as such persons usually have possession for that purpose . . . ." *Id.* at 525. But the court dismissed the argument out of hand, stating: "We have not been inclined in the past to make distinctions in reference to possession, so it is actual, open and visible." *Id.* Obscure or not, *Tillotson* has never been overruled or even questioned, is binding on this court, *see Guaranty Bank v. Chubb Corp.*, 538 F.3d 587, 590 (7th Cir. 2008), and deep-sixes Brown's argument.

Brown also contends that Job's possession was not "exclusive." *Robertson*, 162 Ill. at 575, 44 N.E. at 872. Noting that Polo Builders continued to occupy two offices in the building after the closing, Brown argues that Job and Polo Builders had joint possession of the premises on the petition date.

Given the evidence at trial, the exclusivity argument is unconvincing. True, joint possession is often deemed not to be exclusive possession that will operate as notice, *see, e.g., Roderick v. McMeekin*, 204 Ill. 625, 636, 68 N.E. 473, 477 (1903), and a party's joint possession with the record owner has been said not to serve as notice of that party's rights, *see Union Bank of Chicago v. Gallup*, 317 Ill. 184, 189, 148 N.E. 2, 4 (1925). But the relevant question remains notice to a prospective purchaser (since exclusivity is merely a feature of the kind of possession that will put a purchaser on inquiry notice). If one party occupies and is in control of the premises, and the record owner jointly in possession with that party is present "in a merely subordinate capacity," a purchaser will still be on notice of the first party's interest, notwithstanding the record owner's presence. 5 Herbert Thorndike Tiffany, *supra*, § 1290 at 69.

That was precisely the situation here. The record owner on the petition date was still Polo Builders, and on that date Polo Builders had "possession" of part of the premises. But that possession was limited to two interior offices serving as storage space for furniture and office

equipment. As far as the record shows, the offices were not visible from the street (*see* D. Ex. 7 at 2), and no personnel from Polo Builders ever set foot in the building which was essentially vacant when Job took possession. The mere presence of furniture and equipment stored in two interior offices would not give a purchaser notice of any interest of Polo Builders, *cf. Mack v. McIntosh*, 181 Ill. 633, 643, 54 N.E. 1019, 1022 (1899) (holding that a party's storage of hardware in the cellar of a building did not "constitute such possession as would operate as notice" of his interest in the property), and does not make Job's possession less than exclusive.

Even if the Polo Builders's continued presence raised some question about exclusivity, Polo Builders occupied the offices under a post-closing lease from Job. As Brown acknowledges, notice of a tenant's possession is deemed notice of the landlord's rights. *See Carnes v. Whitfield*, 352 Ill. 384, 390, 185 N.E. 819, 821 (1933); *Gallagher v. Northrup*, 215 Ill. 563, 570, 74 N.E. 711, 713 (1905); *Smith v. Jackson's Heirs*, 76 Ill. 254, 259 (1875); 5 Herbert Thorndike Tiffany, *supra*, § 1291 at 70 ("By the decided weight of authority in this country, a purchaser may, by the possession of a third person, be charged with notice of the rights of one under whom such person holds as a tenant."). If a purchaser chanced to learn of the two offices Polo Builders continued to use for storage after the closing, he would have had inquiry notice of the lease between Polo Builders and Job and so inquiry notice of Job's interest in the property.

Because Brown had inquiry notice of Job's interest in the property on the petition date, Job's interest is superior to the interest Brown holds under section 544(a)(3) of the Code. Judgment will therefore be entered in favor of Job on Count I of the complaint.[9]

---

[9] Brown does make one other argument on the section 544(a)(3) claim. Assuming Job had possession of the property at all, Brown notes that Job had possession for only about a day before the petition was filed. But Brown cites no authority making the length of a party's possession relevant, and there is no reason why it should be. The question here is the notice with

-13-

### b. Preference Claim

On the other hand, judgment will be entered in Brown's favor on the preference claim in Count II. The $190,000 credit that Job received toward the purchase price at the closing was a preferential transfer avoidable under section 547(b) of the Code, 11 U.S.C. § 547(b).

Section 547(b) allows a trustee to avoid a transfer of the debtor's property to a creditor if the transfer took place shortly before the bankruptcy and enabled the creditor to recover more than he would have in the bankruptcy itself. *Warsco v. Preferred Technical Group*, 258 F.3d 557, 563 (7th Cir. 2001); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1171 (7th Cir. 1996). Section 547(b) furthers the central bankruptcy policy of equality of distribution: that "creditors of equal priority should receive pro rata shares of the debtor's property." *Begier v. I.R.S.*, 496 U.S. 53, 58 (1990). By preventing the debtor from favoring certain creditors over others, it also reduces "'the incentive to rush to dismember a financially unstable debtor.'" *Warsco*, 258 F.3d at 564 (quoting *In re Smith*, 966 F.2d 1527, 1535 (7th Cir. 1992)).

For a transfer to be preferential, five elements are necessary: the transfer (1) was made to or for the benefit of a creditor; (2) was for or on account of an antecedent debt; (3) was made while the debtor was insolvent; (4) was made on or within 90 days before the petition date; and (5) allowed the creditor to receive more than he otherwise would have if the case were a case under chapter 7 and the transfer had not been made. 11 U.S.C. § 547(b); *see Warsco*, 258 F.3d at 564; *Superior Toy*, 78 F.3d at 1171. The trustee has the burden of proving each of these elements. *Warsco*, 258 F.3d at 564. In this case, however, Job concedes (by not contesting) the first three elements and disputes only the fourth and fifth.

---

which a purchaser should be charged as of the petition date (and in this case the petition time). That question is the same whether the party had possession of the property for a day or a decade.

Both the fourth and fifth elements were met. The fourth element was met because the transfer was made within 90 days of the petition date. Under section 547(e)(2), a transfer is "made" when it "takes effect between the transferor or transferee . . . ." 11 U.S.C. § 547(e)(2); *see Barnhill v. Johnson*, 503 U.S. 393, 402 (1992). The transfer here took effect on the closing of the real estate sale: Job received the $190,000 credit toward the purchase price – intended as a payment of the $190,000 debt Polo Builders owed him for past carpentry work – at the closing. The closing occurred on July 22, 2004, the day before Polo Builders filed bankruptcy. The transfer was well within the 90-day preference period.

Citing *In re Wey*, 854 F.2d 196 (7th Cir. 1988), Job argues that the transfer occurred, not on the closing date, but when the real estate contract was signed on March 16, 2004, a date outside the 90-day period. But *Wey* is no help to Job. In *Wey*, the debtor made a 10% cash down payment on the purchase of a hotel under a contract providing that the down payment would be forfeited if the debtor defaulted. *Id.* at 197. Sure enough, the debtor defaulted, and the trustee in his chapter 7 case sought to recover the down payment as a preferential or fraudulent transfer. *Id.* The court concluded that the transfer occurred when the debtor tendered the down payment, not when the contract expired of its own terms on the closing date. *Id.* at 199. At that point, the court said, the debtor possessed no rights he could transfer. *Id.*

The differences between *Wey* and this case are considerable. In *Wey*, the debtor made an earnest money down payment consisting of actual funds. Here, the real estate contract between Job and Polo Builders referred to "[i]nitial earnest money" of $190,000, but no funds were ever tendered. The so-called earnest money was really a credit to be given Job in payment of Polo Builders' debt. More important, the contract in *Wey* specifically provided that the debtor would forfeit the down payment upon his default. There was no comparable provision here. The

-15-

contract nowhere made the "earnest money" credit unconditional, forgiving the Polo Builders debt even if Job defaulted and the transaction failed to close. (And understandably so: without a closing there could be no credit against a purchase price because there would be no purchase price.) If Job defaulted, and the sale did not take place, Polo Builders would simply continue to owe Job $190,000 for his unpaid work. The credit took effect at closing, not when the contract was signed, and the transfer therefore occurred during the preference period.

The fifth element of Brown's preference claim was met, as well. That element considers "the results of the transfer," *Warsco v. Ryan (In re Richards)*, 92 B.R. 369, 371 (Bankr. N.D. Ind. 1988), comparing what the creditor actually received or will receive in the bankruptcy case with what the creditor hypothetically would have received in a chapter 7 case if the transfer had not been made, Charles Jordan Tabb, *The Law of Bankruptcy*, § 6.16 at 515 (2d ed. 2009). If the creditor received more as a result of the transfer, the transfer is avoidable. *Superior Toy*, 78 F.3d at 1171. As a rule, any payment to an unsecured creditor will be preferential if the distribution to unsecured creditors in a chapter 7 case would be less than 100%. *Elliott v. Frontier Properties (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir. 1985); *Maxwell v. IDC (In re marchFirst, Inc.)*, 381 B.R. 689, 695 (Bankr. N.D. Ill. 2008); *Schwinn Plan Committee v. AFS Cycle & Co. (In re Schwinn Bicycle Co.)*, 182 B.R. 514, 522 (Bankr. N.D. Ill. 1995).

Unsecured creditors of Polo Builders – the kind of creditor Job would be had he not been paid – will not receive anything approaching 100% payment of their claims. Brown testified that in the Polo Builders bankruptcy alone, creditors have filed $3 million in priority unsecured claims and $22 million in general unsecured claims. The assets in the Polo Builders estate, he said, amount to only $150,000. According to Brown, the maximum amount of additional assets for all the estates is $7,690,000, assuming he prevails in every pending fraudulent transfer action,

in an action against Hasan Merchant, and in the action here. Even if the entire $7,690,000 could be used pay claims in the Polo Builders case (and it could not), Brown would have a total of only $4,840,000 ($7,840,000 minus the $3 million for priority unsecured claims) available to pay $22 million in general unsecured claims. Those creditors would stand to receive only 22% and will in fact be paid far less.[10/] Meanwhile, the $190,000 credit to Job represented a 100% payment of his claim, allowing him to receive far more than if the payment had not been made.

Job objects to this conclusion on two grounds. First, he argues that the determination of what creditors would receive in a hypothetical chapter 7 case must be made as of the petition date. According to Job, Brown made his determination not as of the petition date but as of the trial.

Job is mistaken. The case law does recite that the testing point for determining what the creditor would receive in a liquidation is "the date of the bankruptcy petition." *Superior Toy*, 78 F.3d at 1171; *Gouveia v. Cahillane (In re Cahillane)*, 408 B.R. 175, 210 (Bankr. N.D. Ind. 2009). But Job takes this requirement too literally. The object in setting the petition date as the testing point is simply to consider "the actual effect of the payment as determined when bankruptcy results." *Palmer Clay Prods. Co. v. Brown*, 297 U.S. 227, 229 (1936). The liquidation analysis therefore cannot take into consideration changes in the debtor's assets and liabilities either pre-petition, *see id.* at 229, or post-petition, *see Tenna*, 801 F.2d at 822-23.

---

[10/] This analysis ignores outstanding claims for administrative expenses. *See Neuger v. United States (In re Tenna Corp.)*, 801 F.2d 819, 823 (6th Cir. 1986) (stating that "any administrative expenses incurred during the pendency of the bankruptcy proceeding should be included in the determination"). Attorneys for Brown filed applications seeking more than $2.4 million in fees in the jointly administered cases. (Dkt. Nos. 1024, 1030). The applications drew objections and were ultimately denied without prejudice (Dkt. Nos. 1071, 1072), but they will eventually be refiled again – as will other administrative expense claims. Payment of $2.4 million in attorney's fees would further reduce the distribution to unsecured creditors.

Brown's analysis here did neither. He testified to the assets of the Polo Builders estate as well as to the claims against that estate and concluded, implicitly if not explicitly, that general unsecured creditors would not be paid 100%. Job does not suggest that in reaching his conclusion Brown wrongly considered any post-petition events (such as debt taken on post-petition, *see Tenna*, 801 F.2d at 822). The analysis here was consistent with *Palmer* and *Tenna* and complied with section 547(b)(5). *See Taunt v. Fidelity Bank of Mich. (In re Royal Golf Prods. Corp.)*, 908 F.2d 91, 95 (6th Cir. 1990) (approving trustee's comparison of assets and claims "conducted on a post-filing basis"); *marchFirst*, 381 B.R. at 695 (same).

Job's second ground for objecting to the section 547(b)(5) analysis concerns Brown's testimony about the unsecured claims in the case. Job notes that Brown failed to say – in fact, did not know – whether any unsecured claims were objectionable. That makes it impossible, so Job asserts, to determine what the distribution to unsecured creditors would be and so whether Job indeed received more as a result of the transfer.

Again, Job is mistaken. Brown based his analysis on the claims that had been filed. Claims that are filed are deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). At the time of trial, Brown had not objected to any claims (the court's docket shows he has since objected to one), nor had any other party in interest. It was entirely proper for Brown to determine the amount of unsecured claims for purposes of section 547(b)(5) based on the claims then allowed without considering claim objections he had yet to file and or even consider filing. Only one decision, *Shapiro v. Art Leather, Inc. (In re Connolly N. Am., Inc.)*, 398 B.R. 564, 581-82 (Bankr. E.D. Mich. 2008), supports Job's view, and conclusion in *Connolly* was incorrect. Here, moreover, it is highly unlikely that successful claim objections – and there is no guarantee Brown's objections, should he bring them, will be successful – would generate a 100%

distribution to unsecured creditors. For that to happen, more than $18 million in general unsecured claims would have to be disallowed, better than 80% of all the general unsecured claims filed. No evidence at trial suggested such an outcome was even conceivable, let alone probable.

Because the $190,000 credit Job received was a preferential transfer avoidable under section 547(b) and recoverable under section 550(a), judgment will be entered in favor of Brown and against Job on Count II.

### 4. Conclusion

For these reasons, the court finds (1) in favor of defendants on Manco Carpentry Group, Manco Construction, Inc., and Manco Homes, Inc. and against plaintiff David R. Brown on all counts of the complaint; (2) in favor of defendant Kamil Job and against plaintiff David R. Brown on Count I of the complaint; and (3) in favor of plaintiff David R. Brown and against defendant Kamil Job on Count II of the complaint. Brown is entitled to judgment against Job on Count II in the amount of $190,000. Count III of the complaint will be dismissed as moot. A separate judgment order will be entered consistent with this opinion.

Dated: August 18, 2010

_____
A. Benjamin Goldgar
United States Bankruptcy Judge